UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PRIDE KIA, INC.,
          Plaintiff

v.
                                   Civil Action No. 08-10117

KIA MOTORS AMERICA, INC,
          Defendant

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff, Pride Kia, Inc. ("Pride") hereby submits this Memorandum in Support of Pride's Cross-Motion for a Preliminary Injunction prohibiting Kia Motors America, Inc., ("KMA") from terminating the Pride Kia franchise.  Pride is seeking the same relief granted in the Temporary Restraining Order which was issued in the Bristol County, Massachusetts Superior Court first on January 18, 2008, and again on January 22, 2008.

## BACKGROUND INFORMATION

Plaintiff, Pride Kia, Inc. ("Pride") is a Massachusetts Corporation located in North Attleboro, Massachusetts.  Defendant Kia Motors America, Inc., ("KMA") is a California Corporation based in Irvine, California and a manufacturer of motor vehicles.  Pursuant to a Kia Dealer Sales and Service Agreement (the "Dealer Agreement") between the parties, Pride is a Kia Dealer.[1]

---

[1] See, Verified Complaint at ¶¶ 1 – 3; Supplemental Affidavit of Alfredo DosAnjos at ¶¶ 1 - 3.

During its time as a Kia Dealer, Pride has become increasingly frustrated with KMA's failures to comply with the Dealer Agreement and with State and Federal law.[2]  Because of this frustration, Pride's President, Alfredo DosAnjos, was interested when KMA approached him with an offer in July of 2007.  KMA offered to repurchase Pride's entire new car inventory if Pride gave up its franchise.[3]  When he received confirmation that the KMA agents making the offer had the authority to do so, he accepted and began making preparations to terminate the dealership.[4]

Pride reasonably assumed that implicit in the offer was that KMA would comply with all of its other statutory and contractual obligations.[5]  It wasn't until later that Mr. DosAnjos began to suspect that KMA did not intend to comply with those obligations and that Pride would have to fight with KMA to enforce the Dealer's statutory and contractual rights.[6]

In September of 2007, after Pride had taken steps to prepare for termination, KMA sent him a "voluntary termination agreement" which included a full release.  Mr. DosAnjos could not sign such a release because he knew that there were a number of outstanding issues which, he had also assumed, would be worked out in good faith between the parties including unpaid rebate claims and unpaid warranty claims.  He was concerned that a release would prevent Pride from obtaining the money it was rightfully owed on such claims.[7]

---

[2] Supplemental Affidavit of Alfredo DosAnjos at ¶¶ 5 - 7. See also discussion, infra.
[3] Massachusetts State law provides for more limited repurchase obligations.  See, M.G.L.A. c. 93B § 5(k).
[4] See, Supplemental Affidavit of Alfredo DosAnjos at ¶¶ 7 - 9.
[5] Supplemental Affidavit of Alfredo DosAnjos at ¶¶ 15 - 18.
[6] Id.
[7] Supplemental Affidavit of Alfredo DosAnjos at ¶¶ 10 – 18.

Pride continued to work to resolve those other issues with KMA.  Initially, Mr. DosAnjos was willing to agree on some issues now and work out the remaining issues later. As time went on however, Pride became increasingly concerned that KMA was not acting in good faith.[8]  On no less than 4 occasions, Pride suggested that the parties meet and confer to discuss settlement and invited KMA to the dealership to do so, but each time KMA refused the invitation.[9]

Finally, Pride came to understand that, unless it resolved all of the issues with KMA at once, it would be forced to sue KMA to enforce those rights.  Pride tried to achieve a global settlement, but KMA refused, insisting that it wanted to resolve the termination of the dealership separately. [10]

Thereafter, by letter dated January 4, 2008, KMA notified Pride that it was terminating the Dealer Agreement 15 days after Pride received that notice.  KMA's notice said that it was doing so because the Pride Kia dealership was closed for more than 7 consecutive business days.   On information and belief, the termination notice was made in retaliation for Pride's failure to make concessions to KMA in negotiations.[11]  Discovery will help to confirm the basis for this notice.

 Before the close of those 15 days, the Pride Kia dealership fully reopened and has remained open.   While it is true that Pride closed the dealership in preparation for the

[8] Supplemental Affidavit of Alfredo DosAnjos at ¶¶ 14 – 17.
[9] Supplemental Affidavit of Alfredo DosAnjos at ¶ 14.
[10] Supplemental Affidavit of Alfredo DosAnjos at ¶¶ 14 – 18.
[11] Supplemental Affidavit of Alfredo DosAnjos at ¶¶ 19 – 20.

expected and agreed upon termination, it did so based on false assumptions about KMA's good faith.  Because it appears that KMA will not fulfill its promises, Pride intends to maintain its Kia Dealership indefinitely, although it will enforce KMA's statutory and contractual obligations.[12]

KMA claims in a December 7, 2007 letter that Pride "ceased operations some time ago,"[13] but it must know that to be untrue.  KMA approached Pride directly during that time and requested that Pride process sales of nearly 100 Kia vehicles, and Pride did so. These were sales that originated with KMA, not with Pride, and KMA asked Pride to help process the sale to a car rental company in Rhode Island.[14]

In dozens of such transactions throughout the period from September 2007 through January 2008 KMA sent Pride the paperwork for the vehicles and Pride prepared the sales. In fact, at least *11* such sales occurred after KMA claimed that Pride had "ceased operations some time ago."  There were even 5 sales after KMA sent a notice of termination to Pride. Each of those sales originated with KMA and each was sent to Pride to process the paperwork.[15]

Below are some other examples of KMA's failure to fulfill its obligations.

---

[12] Supplemental Affidavit of Alfredo DosAnjos at ¶¶ 21 – 28.
[13] See, Declaration of Jason P. Isralowitz.
[14] Supplemental Affidavit of Alfredo DosAnjos at ¶¶ 26 – 29.
[15] Supplemental Affidavit of Alfredo DosAnjos at ¶¶ 26 – 36.

**KMA's Rebate Practices**

As with other manufacturers, KMA advertises various incentives to prospective purchasers, sometimes in the form of "rebates" in order to sell its vehicles.  Frequently, customers "assign" their rebate to the dealer in order to lower the purchase price of the vehicle.  KMA is then obligated to pay that rebate to the dealer.[16]

Pride has struggled for years to obtain reimbursement under KMA's rebate programs.  Currently, Pride is seeking payment from KMA for rebates in excess of $34,000.  Often Pride sent requests for payment to KMA more than once, and the requests were ignored more than once. [17]

Finally, after receiving a letter from Pride's attorneys, KMA explained the basis for non payment.  In some cases, KMA asserted that, although Pride reported a sale for rebate within days of the sale, the report was not timely.  KMA claims that Pride could have received the rebate, if only it had submitted an "exception request" in time, but KMA didn't tell Pride this until it was too late. [18] In many cases, KMA ignored Pride's repeated requests for payment or explanation, and then told Pride it was too late to seek payment.[19]

Such behavior is unique among the manufacturers with whom Pride's President has worked.  If other manufacturers believe there is some administrative flaw or error, they will notify the dealer quickly so that the error can be corrected and the rebate issued.  KMA is

---

[16] See, Verified Complaint at ¶¶ 7 − 11.
[17] Id.
[18] Supplemental Affidavit of Alfredo DosAnjos at ¶¶ 40 − 47.
[19] See, Verified Complaint at ¶¶ 12 − 13.

the only manufacturer that will ignore repeated requests for information and then use the passage of time as an excuse for not paying rebates that were rightfully earned.[20]

## KMA's Warranty Claim Practices

Pride has also struggled to obtain payment for warranty work it performed, often waiting months and having to resubmit paperwork repeatedly.  Currently, there is one remaining warranty claim pending, in the amount of $8,551.05 that KMA continues to refuse to pay.[21]

## KMA's "Administrative Fee"

At some point in 2006, KMA began charging Pride an administrative fee in the amount of $100 for each time Pride accessed the Dealer Computer system to make corrections. The Dealer Agreement does not include any provision for such a fee, and KMA's attempt to insert such an obligation is without justification and without consideration.  Pride's investigation reveals that the total amount in such fees charged is $2,900. [22]

**ARGUMENT**

## Legal Standard

In the First Circuit, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction.  The Court must find: (1) that plaintiff will suffer irreparable injury

---

[20] Supplemental Affidavit of Alfredo DosAnjos at ¶¶ 46 – 47.
[21] See, Verified Complaint at ¶¶ 12 – 13.
[22] See, Verified Complaint at ¶¶ 14 – 16.

if the injunction is not granted; (2) that such injury outweighs any harm which granting the injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.  Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12 (1st Cir. 1996); B.P.G. Autoland Jeep-Eagle, Inc. v. Chrysler Credit Corp., 785 F. Supp. 222, 227 (D. Mass. 1991), quoting Women's Community Health Center, Inc. v. Cohen, 477 F. Supp. 542, 544 (D. Me. 1979).

In considering a request for injunctive relief the court must first evaluate the moving party's claim of injury together with its chance of success on the merits.  If the failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the court must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party.  Id.  The amount of potential irreparable harm that each party may suffer does not matter; instead, the court must evaluate the risk of such harm in light of the party's chance of success on the merits.  Id., citing Packaging Industries Group, Inc., v. Cheney, 380 Mass. 609, 617 (1980).  If the dispute is not between private parties, in addition to the principles set forth above, the Court should consider the risk of harm to the public interest.  Biotti v. Bd. of Selectmen of Manchester, 25 Mass.App.Ct. 637, 640 (1988); Commonwealth v. Mass. CRINC, 392 Mass. 79, 89 (1984); GTE Products Corporation v. Jefferson Davis Steward, 414 Mass. 721, 723 (1993).

**Pride is likely to prevail on its 93B Count**

Massachusetts General Law's c. 93B §3 prohibits unfair methods of competition and unfair or deceptive acts or practices. Section 4 of the Act goes on to define a violation of the previous section as, among other things, engaging "in any action which is arbitrary, in bad faith, or unconscionable and which causes damage to the … motor vehicle dealer."

KMA has violated this statute in a variety of ways, including the violations set forth above.  For example, Section 9 of the Act permits a Dealer to submit an incentive claim to the manufacturer "at anytime within 6 months after the date of the retail sale or at the end of the program period, whichever is later…."  KMA's refusal to pay Pride for the incentive claims, and refusal to explain why, constitutes violations of the Act.

In the present case, KMA's breach of the implied covenant of good faith and fair dealing as set forth below, also establishes that KMA's actions were unfair or deceptive in violation of G.L. c. 93B.  KMA's threat and action to terminate Pride's dealership was without the warning required, given the status of the relationship between the parties, and was retaliatory.  This is precisely the type of conduct that G.L. c. 93B is intended to remedy.

**Pride is likely to prevail on its Contract claims.**

"[T]he rule is clear in Massachusetts that every contract is subject to an implied covenant of good faith and fair dealing." Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 473 (1991), citing Warner Ins. Co. v. Commissioner of Ins., 406 Mass. 354,

362 at n. 9 (1990); <u>Kerrigan v. Boston</u>, 361 Mass. 24, 33 (1972). "The implied covenant of good faith and fair dealing provides 'that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . .' " <u>Anthony's Pier Four, Inc.</u>, 411 Mass. at 472, <u>citing</u> <u>Drucker v. Roland Wm. Jutras Assocs.</u>, 370 Mass. 383, 385 (1976), <u>quoting</u> <u>Uproar Co. v. National Broadcasting Co.</u>, 81 F.2d 373, 377 (1st Cir. 1936), cert. denied, 298 U.S. 670 (1936).

One party's use of a discretionary right under an agreement as a pretext constitutes a breach of the covenant of good faith and fair dealing. <u>Anthony's Pier Four, Inc.</u>, 411 Mass. at 473 (court found violation of implied covenant of good faith and fair dealing when one party used its discretionary right, applying pressure on the other party, in an attempt to force that party to sweeten the deal) <u>citing</u> <u>Northern Heel Corp. v. Compo Indus., Inc.</u>, 851 F.2d 456, 471 (1st Cir. 1988) (applying Massachusetts law, court found violation of implied covenant of good faith and fair dealing in repudiation that was 'but a tool engineered to serve the illicit purpose' of extracting price concessions).

In this case, KMA was perfectly willing to treat Pride as an ongoing concern when it suited the manufacturer's interests.  KMA needed Pride's help to process the sales of nearly 100 vehicles, (even after KMA issued a notice of termination), but it sent a notice of termination in order to coerce concessions out of Pride, or perhaps to achieve by unilateral action that which it could not achieve through negotiation.  By repeatedly calling on Pride to

assist in its fleet sales throughout this period, KMA is estopped from claiming that Pride had ceased its operations and terminating Pride on that basis.

KMA's conduct violates the implied covenant of good faith and fair dealing.  KMA's efforts to coerce Pride to terminate its dealership with no assurances that KMA will comply with its statutory or contractual obligations, are the very facts that make it likely that Pride will succeed in proving that KMA has willfully "destroy[ed] or injur[ed] [their] right to receive the fruits of the contract and thus violated the implied covenant." Anthony's Pier Four, Inc., 411 Mass. at 472.

Although Pride can establish a likelihood of success, it is important to keep in mind that a "no-lose situation for plaintiff is not a prerequisite for injunctive relief." B.P.G. Autoland Jeep-Eagle, Inc. v. Chrysler Credit Corp., 785 F. Supp. at 227.  "[A] court's conclusions as to the merits of the issues presented on preliminary injunction are to be understood as statements of *probable* outcomes." Narragansett Indian Tribe v. Guilbert, 934 F.2d 450, 451 (1st Cir. 1978) (emphasis in original).

**A denial of Pride's motion for injunctive relief**
**will subject it to a substantial risk of irreparable harm.**

Irreparable injury has been defined as "a loss of rights that cannot be vindicated should [the moving party] prevail after a full hearing on the merits." Packaging Indus. Group, Inc., 380 Mass. at 616.

The closure Pride's business constitutes irreparable harm. See, Kenworth of Boston, Inc. v. Paccar Financial Corp., 735 F.2d 622, 625 (1st Cir.,1984) (finding that, in the

absence of business closure there was no irreparable harm) <u>citing</u>, <u>Chinetti-Garthwaite v.</u>

<u>Ferrari Societa per Azioni Esercizio Fabbriche Automobilil e Corse</u>, 463 F.Supp. 73, 75

(E.D.Pa., 1978).  It is well established that the loss of a business' reputation and goodwill

also constitutes irreparable injury.  <u>See</u> <u>e.g.</u>, <u>Basicomputer Corp. v. Scott</u>, 973 F.2d 507

(6th Cir. 1992); <u>Alexander & Alexander, Inc. v. Danahy</u>, 21 Mass.App.Ct. 488 (1986).

> Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable.  Indeed, when the potential economic loss is so great as to threaten the existence of the moving party's business, then an injunction may be granted, even though the amount of direct financial harm is readily ascertainable.  11 C. Wright & A. Miller, Federal Practice and Procedure       §2948, p. 439.

Without an injunction, Pride Kia will go out of business altogether.[23]  Such an

outcome constitutes irreparable harm.  <u>See</u>, <u>Kenworth of Boston, Inc.</u>, 735 F.2d at 625;

c.f., <u>Foreign Motors, Inc. v. Audi of America, Inc.</u>, 755 F.Supp. 30, 33 (D.Mass., 1991)[24].

If Pride's only dealership is forced to close, then it will mean the end for the Plaintiff and

deprive it of all choices about its future course, such as whether to continue the dealership

or sell it to a third party.

## The Balance of Hardships Weighs in Pride's Favor

The third element in the determination whether to issue a preliminary injunction is

"the balance of interests as between the parties, i.e., whether the harm to the movant if the

---

[23] Supplemental Affidavit of Alfredo DosAnjos at ¶¶ 37 – 39.
[24] The <u>Foreign Motors, Inc.</u> court refused to issue preliminary injunction where plaintiff Foreign Motors, Inc. would "still be able to deal in BMW, Mercedes-Benz and Porsche automobiles."

injunction is withheld outweighs the harm to the non-movant if the injunction is granted."
Cohen v. Brown University, 991 F.2d 888, 902 (1st Cir. 1993).

The balance of hardship clearly favors Pride.  Denial of preliminary injunction
amounts to the death penalty for Pride; its business operations would be entirely terminated
and extinguished.  Grease Monkey International, Inc. v. Ralco Lubrication Services, Inc., 24
F. Supp. 2d 120, 125 (D. Mass. 1998).  On the other hand, the granting of a preliminary
injunction would not cause any material harm to the defendant.  Defendant argues that the
granting of a preliminary injunction would prevent it from serving its existing customers and
selling to new and repeat customers in the region.  However, there is no affidavit or other
factual showing whatever to support this argument.  Moreover, it defies logic that
customers in the region cannot access Kia dealers.  The region is served not only by Pride in
North Attleboro, but by five other existing Kia dealers within a 25-mile radius of Pride's
facility ------ in New Bedford, Braintree, Shrewsbury, Johnston, RI, and Putnam, CT.
There is no showing whatever that customers are not being served or that sales are being
lost.

Defendant also argues that granting a preliminary injunction will delay defendant in
attempting to appoint a replacement dealer, by reason of having to comply with ch. 93B's
requirement to give 90 days notice to existing dealers.  This argument presumes that Pride
will lose this action, and that Pride will be terminated as a dealer, which will not be the
case.

12

However, even assuming that Pride ultimately loses the case and is terminated as a dealer, all that matters in the present balancing of hardships is whether a preliminary injunction now would ultimately delay the commencement of operations of a replacement dealer.  The defendant has made no factual showing whatever on this point.  The mere appointment of a replacement dealer does not mean that the newly appointed dealer would immediately be up and running.  It could take years for a replacement dealer to purchase premises and construct facilities from which to operate a dealership.

Neither has the defendant made any factual showing that the granting of a preliminary injunction to Pride would cause any material delay in this process.  The defendant has not even shown that it is ready to immediately appoint any replacement dealer or that it has any particular candidate.  Defendant's Declaration of Melanie Daugherty states in paragraph 9 that it has not yet even commenced the process of soliciting candidates to be the replacement dealer.

In sum, the harm that would certainly result to Pride if preliminary injunction is denied clearly outweighs any speculative harm to the defendant if preliminary injunction is granted, continuing the existence of Pride's dealership until trial.

**The Public Interest
Favors the Granting of Pride's Motion**

The public interest would be served by granting Pride's motion for preliminary injunction.  The right to preliminary injunction in this case is not based merely upon the

inherent equitable powers of the court.  Rather, the applicable statute expressly provides for preliminary injunctive relief, confirming the public interest in the issuance of such relief.

The legislative purpose in enacting ch. 93B, including its provisions regarding dealers' rights to injunctive relief, was not merely to protect the private interests of dealers but also to protect the public interest.  The public interests served by ch. 93B have been recognized by the Massachusetts Supreme Court.

Chapter 93B declares unlawful various methods, acts, and practices, including but not limited to wrongful termination of dealer franchises, which are perpetrated in the automotive industry by manufacturers against dealers, **"and which ultimately affect consumers**." American Honda Co., Inc. v. Bernardi's, Inc., 432 Mass. 425, 735 N.E.2d 348, 350 (2000); Toberg Foreign Motors, Inc. v. Reiter Oldsmobile, Inc., 376 Mass. 313, 381 N.E.2d 908, 912 (1978).

> "[A] preliminary injunction must be granted … where
> private right and a strong statutory public policy coincide
> in demanding maintenance of a status quo of dealing."

Autowest, Inc. v. Peugeot, Inc., 287 F.Supp. 718, 720 (E.D.N.Y. 1966).

Enjoining termination of a dealership serves the public interest by maintaining the number of outlets available to serve consumers, maintaining the supply of services and goods available to consumers, and promoting competition which benefits consumers.  Grease Monkey International, Inc. v. Ralco Lubrication Services, Inc., 24 F.Supp.2d 120, 126 (D. Mass. 1998).

**<u>Granting Pride's Motion Will
Preserve the Status Quo</u>**

The basic function of preliminary injunction is to preserve the status quo pending

determination of the action on the merits.  <u>Ricci v. Okin</u>, 978 F.2d 764, 767 (1st Cir.

1992), <u>citing</u> <u>Chalk v. U.S. District Court</u>, 840 F.2d 701, 704 (9th Cir. 1988); Wright-

Miller-Kane, Federal Practice & Procedure, Vol. 11A, §2948, at 133.  In the present case,

preservation of the status quo requires granting Pride's motion for preliminary injunction.

WHEREFORE, Pride prays that this Court grant Plaintiff's Cross-Motion for a

Preliminary Injunction, enjoining the Defendant, Kia Motors America, Inc., from

terminating the Pride Kia Inc. dealership, franchise and/or dealer agreement during the

pendency of this Action.

Respectfully submitted,
Pride Kia, Inc.,
By Its Attorneys


<u>/s/ Michael W. Carroll</u>
Michael W. Carroll, BBO 563653
72 Pine Street
Providence, RI 02903
401 454-4900 (Tel.)
401 454-4902 (Fax)


_____
John D. Deacon, BBO 117020
72 Pine Street
Providence, RI 02903
401 272-8080 (Tel.)
401 521-3555 (Fax)

### **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing

and paper copies will be sent to those indicated as non registered participants on this the

 20th  day of February, 2008.


*/s/ Michael W. Carroll*