UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PRIDE KIA, INC.,<br>          Plaintiff<br><br>v.<br><br>KIA MOTORS AMERICA, INC,<br>          Defendant | Civil Action No. 08-10117 |

PRETRIAL MEMORANDUM OF PLAINTIFF PRIDE KIA, INC.

## 1.  Concise Summary of the Evidence

Since 1998 Pride operated a Kia automobile dealership in North Attleboro,

Massachusetts under a Dealer Sales and Service Agreement (the "Dealer Agreement") with

Defendant KIA Motors America, Inc., ("KMA").  Effective March 10, 2008, KMA

terminated the franchise and Pride was no longer a Kia dealer.

During its time as a Kia Dealer, Pride had become increasingly frustrated with

KMA's breaches of the Dealer Agreement and violations of State and Federal law.   Because

of this frustration, Pride's President, Alfredo DosAnjos, was interested when KMA

approached him with an offer in July of 2007.  KMA offered to repurchase Pride's entire

new car inventory if Pride gave up its franchise.   When he received confirmation that the

KMA agents making the offer had the authority to do so, he asked to see the documents in

writing and then by return email dated August 28, 2007, he reminded KMA's

representative of the issue of the repurchase of the sign had already been agreed and said that

"everything else is acceptable including all dates and timelines."

Pride reasonably assumed that implicit in the offer was that KMA would comply with

all of its other statutory and contractual obligations.   It wasn't until later that Mr. DosAnjos

began to suspect that KMA did not intend to comply with those obligations and that Pride

would have to fight with KMA to enforce the Dealer's statutory and contractual rights.

In September of 2007, after Pride had taken steps to prepare for termination, KMA

sent him a "voluntary termination agreement" which included a full release.  Mr. DosAnjos

could not sign such a release because he knew that there were a number of outstanding

issues which, he had also assumed, would be worked out in good faith between the parties

including unpaid rebate claims and unpaid warranty claims.  He was concerned that a release

would prevent Pride from obtaining the money it was rightfully owed on such claims.

Pride continued to work to resolve those other issues with KMA.  Initially, Mr.

DosAnjos was willing to agree on some issues now and work out the remaining issues later.

As time went on however, Pride became increasingly concerned that KMA was not acting in

good faith.   On no less than 4 occasions, Pride suggested that the parties meet and confer to

discuss settlement and invited KMA to the dealership to do so, but each time KMA refused

the invitation.

Finally, Pride came to understand that, unless it resolved all of the issues with KMA

at once, it would be forced to sue KMA to enforce those rights.  Pride tried to achieve a

global settlement, but KMA refused, insisting that it wanted to resolve the termination of the dealership separately.

## SUMMARY OF CLAIMS

Pride's various claims against KMA are set forth in summary as follows:

**KMA's Promise to Repurchase the Vehicles**

In the summer of 2008, KMA promised to repurchase the new vehicle inventory if Pride would give up its dealership.  By email dated August 28, 2007, Pride responded to KMA's written proposal (termination procedures), reminded KMA's representative of the issue of the repurchase of the sign and said that "everything else is acceptable including all dates and timelines."

Because KMA failed to keep its promise and following the termination of the Franchise and because Pride was no longer a dealer, it was severely limited in how it could sell the remaining vehicles.  Pride suffered damages from KMA's breach in the amount of **$46,351.00.**  These figures are based upon the sale of the vehicles to an affiliated entity, Pride Ford of North Attleboro, Inc., ("Pride Ford").

While KMA denies all liability on this point, it is expected to claim that even if it is found liable, the appropriate measure of damages should be based upon price at which Pride Ford ultimately sold the vehicles, which would amount to **$27,299.00.**

**KMA's Rebate Practices**

As with other manufacturers, KMA advertises various incentives to prospective purchasers, sometimes in the form of "rebates" in order to sell its vehicles.  Frequently, customers "assign" their rebate to the dealer in order to lower the purchase price of the vehicle.  KMA is then obligated to pay that rebate to the dealer.

Pride has struggled for years to obtain reimbursement under KMA's rebate programs.  Currently, Pride is seeking payment from KMA for rebates of **$33,950.**  Often Pride sent requests for payment to KMA more than once, and the requests were ignored more than once.

**KMA's Warranty Claim Practices**

Pride has also struggled to obtain payment for warranty work it performed, often waiting months and having to resubmit paperwork repeatedly.  Only after a lawyer's letter did KMA begin to address these issues.  Currently, there is one remaining warranty claim pending:  RO number 434469 in the original amount of $8,551.05.  Pride obtained pre-approval for all that it did on this claim, but KMA has still failed to pay despite the passage of 18 months.  KMA did credit some of that claim in February, then charged it back, and then paid a part in April of 2008, leaving a balance due of **$4,491.89**.

**KMA's "Administrative Fee"**

At some point in 2006, KMA began charging Pride an administrative fee in the amount of $100 for each time Pride accessed the Dealer Computer system to make corrections. The Dealer Agreement does not include any provision for such a fee, and

KMA's attempt to insert such an obligation is without justification and without

consideration.  Pride's investigation reveals that the total amount in such fees charged is

**$2,900**.

**KMA's Statutory Repurchase Obligations**

The Massachusetts Dealer's Statute (M.G.L. c. 93B § 5) imposes certain obligations

upon manufacturers.  Among those is the requirement that, upon termination, a

Manufacturer is required to repurchase signs, tools and equipment and parts.[1]

**The KIA Sign**

As part of a program requiring dealers to purchase new KIA signage, KMA agreed to

pay half of the total cost, which was **$12,767.15**.  Although Pride paid KMA's designated

sign company its one half share, KMA never did so.  In any event, in his August 28, 2007 e-

mail to Barbara Robinson, KMA's Regional Market Representation Manager, Mr. DosAnjos

notes that KMA had already agreed to repurchase the new KIA sign.  In accordance with its

statutory obligations, and to fulfill its promises, KMA is therefore required to pay Pride

**$12,767.15**.

---

[1] (k) In the event of a termination, the manufacturer or distributor shall…

(2) if requested by the dealer within the same 60 day period, repurchase all genuine new and unused motor vehicle parts and accessories that it sold to the motor vehicle dealer so long as the same are undamaged, in their original packaging and listed in the current parts and accessories price list of the manufacturer or distributor, at a price equal to the wholesale price stated in the current parts and accessories price list of the manufacturer or distributor less all incentives and allowances received by the dealer and without reduction for such repurchase or for processing or handling the repurchase;  if the dealer has transferred to the manufacturer or distributor full right and legal title to the parts and accessories before their repurchase;  and

(3) if requested by the dealer within the same 60 day period, repurchase the new and used equipment that it sold to the motor vehicle dealer at its then fair market value, including, but not limited to, signs, special tools and manuals, which the manufacturer or distributor required the motor vehicle dealer to purchase;  if the dealer has transferred to the manufacturer or distributor full right and legal title to the equipment before their repurchase.

**The KIA Tools and Equipment**

Pride also has certain KMA-specific tools and equipment.  Despite its obligation to do so, KMA has thus far not paid for Pride's tools and equipment.  The total value of those items is **$32,500**. KMA recently produced a document entitled "Dealer Tool Return-Final" reflecting tools and equipment returned by Pride and identifying KMA's claimed value for each, and showing a total value of **$9,863.19**.  KMA has paid nothing for the parts so far.

**The Repurchase of Parts**

Although KMA admits that it is required to pay for returned parts, it has failed to pay any amount for the parts thus far.  The repurchase price for the Pride Kia parts inventory as of August 31, 2007 is **$76,765**.  KMA recently produced a "Credit/Debit Memo" dated April 14, 2008 identifying returned parts and totaling **$70,184.17.**

**The Floorplan Interest Charges, the
Part Statement System Charges and the Reynolds
& Reynolds Computer Charges**

Unfortunately, a great deal of time elapsed since KMA offered to repurchase Pride's new vehicle inventory if Pride voluntarily terminated, and Pride accepted that offer.  In correspondence and discussions with Barbara Robinson and other KMA representatives, Pride conveyed that acceptance and began the termination process, believing that termination date to be on or about August 31, 2007.  In September, it appeared that KMA wanted Pride to give up certain rights and take on additional obligations.

Because of the passage of time since August 31, Pride has incurred substantial costs

for Floorplan interest, and computer charges, including the KMA computer system for the

Parts Statement Services and the dealer Management Software provided to Pride from

Reynolds & Reynolds.  Those charges exceed **$25,000.**

Pride is therefore seeking damages as follows:

| Claim | Damages |
|---|---|
| KMA's Warranty Claim Practices | $4,491.89 |
| The KIA Tools and Equipment | $32,500.00 |
| The Repurchase of Parts | $76,765.00 |
| KMA's Rebate Practices | $33,950.00 |
| The KIA Sign | $12,767.15 |
| KMA's "Administrative Fee" | $2,900.00 |
| KMA's Promise to Repurchase the Vehicles | $46,351.00 |
| KMA parts computer system | $5,025.91 |
| Floorplan interest | $6,403.98 |
| Reynolds and Reynolds charges | $14,179.27 |
| **Total:** | **$235,334.20** |

**2.  Facts as Established by Pleadings or Stipulations of Counsel**

a.  Plaintiff Pride Kia, Inc., ("Pride") was an authorized Kia Motors America, Inc. ("KMA") Kia automobile dealer since 1998.

b.  Effective March 10, 2008, Pride was terminated as a Kia Dealer.

c.  On March 14, 2008, Pride requested that KMA repurchase "all genuine new and unused motor vehicle parts and accessories…" and "the new and used equipment that it sold to the motor vehicle dealer at its then fair market value, including, but not limited to, signs, special tools and manuals…."

7

> d. KMA has valued the motor vehicle parts and accessories returned by Pride at $70,184.17.
>
> e. KMA has valued the equipment and tools returned by Pride at $9,863.19.

## 3. Contested Issues of Fact

The contested issues of fact may be separated into three categories: the breach of the repurchase agreement, the pre-termination violations/breaches, and the post termination violations/breaches.

<u>The Breach of the Repurchase Agreement</u>

Pride asserts, and KMA denies, that there was an enforceable contract to repurchase the entire new vehicle inventory from Pride, and that KMA breached that agreement. Furthermore, if there was such a contract, KMA disputes the manner in which Pride calculated its damages.

The dispute over damages includes the amount of the claimed loss on the sale of the new vehicles, and the consequential damages resulting from delays including the extended use of the KMA Parts Computer System, Floorplan interest charges, and charges resulting from Pride's need to maintain its computer service through Reynolds & Reynolds.

<u>The Pre-termination Violations/Breaches</u>

The parties dispute all of the claims relating to vehicle incentives with KMA asserting that it owes nothing on such claims, and Pride claiming damages of $33,950.00

The parties dispute the claims relating to warranties, with Pride claiming that KMA still owes $4,491.89 on a remaining warranty claim, and KMA denying all liability.

The parties also dispute the validity of KMA's administrative charges to Pride, which total $2,900.

The Post-Termination Violations/Breaches

Although it is not expected that KMA will deny its obligation to repurchase the parts tools and equipment from Pride, in accordance with M.G.L. c. 93B, it is expected to deny that it has violated that statute by failing to pay any amounts to date.

As to the amounts owed for the repurchase, Pride claims that KMA owes $76,765.00 for returned parts, while KMA is expected to claim that it owes only $70,184.17.  For the returned tools and equipment, Pride claims that KMA owes $32,500.00, while KMA is expected to claim that it owes only $9,863.19.

The statute also requires that KMA repurchase the signs from Pride, and Pride claims that the amount owed for those signs is $12,767.15.  KMA is expected to deny that it is required to repurchase the sign, since Pride has so far paid just over half of the price of those signs.

**4. Jurisdictional Questions**

None.

**5.  Questions raised by pending motions**

None.

**6. Issues of law, including evidentiary questions, together with supporting authority[2]**

KMA is disputing whether there was any contract formed, claiming that the Dealer

Agreement required such agreements to be in writing.  Pride disputes this assertion:  "It is

open to the parties to modify a written agreement by a later agreement not in writing.…

The later agreement may be proved through the conduct of the parties." Tomer v. Hollister

Associates, Inc.  2007 WL 2908268, 4 Mass.App.Ct.)   (Mass.App.Ct.,2007) citing

Schinkel v. Maxi-Holding, Inc. 30 Mass.App.Ct. 41, 47 (1991). See, First Pa. Mort. Trust

v. Dorchester Sav. Bank, 395 Mass. 614, 625 (1985) ("It is a settled 'principle that the mode

of performance required by a written contract may be varied by a subsequent oral

agreement based upon a valid consideration" ' [citations omitted]).

KMA is disputing the manner in which the repurchase price (under M.G.L. c. 93B, §

5(k)(3)) of the tools and signs is calculated.  KMA is expected to assert that a different

standard is applicable:  that is, KMA is expected to claim that based upon its accounting

depreciation schedule, any tools or signs that are more than 3 years old, have zero value.

The statute provides that KMA must repurchase those items at its "then fair market value".

Fair Market Value or "fair cash value" is defined as "the price an owner willing but not under

compulsion to sell ought to receive from one willing but not under compulsion to buy."

Taunton Redevelopment Associates v. Board of Assessors of Taunton, 393 Mass. 293, 295,

---

[2] Those issues have been identified in the proposed jury instructions and elsewhere in this memorandum.

471 N.E.2d 75, 76 (Mass.,1984) quoting Boston Gas Co. v. Assessors of Boston, 334 Mass.

549, 566, 137 N.E.2d 462 (1956).

### 7.  Any requested amendments to the pleadings

Pride is not seeking to amend the pleadings and will oppose any motion to do so by

the Defendant.  The parties were negotiating agreed amendments including KMA's

proposed amended answer that would have added two affirmative defenses:  a statute of

frauds defense and one other.[3]  KMA later chose not agree to the amendments, and did not

seek to amend by motion, and it is now too late to do so.  Pride wishes to be clear that it

does not consent to such amendments at this stage.

### 8.  Any additional matters to aid in the disposition of the action

Pride requests that the parties be instructed to make no reference to the preliminary
injunction hearing or the resulting

### 9.  The probable length of trial

Pride estimates that the trial will take 4 – 5 days.

### 10.  Witnesses

a.  Alfredo Dos Anjos is expected to testify regarding the agreement with Defendant Kia
    Motors America ("KMA") to return Kia franchise, regarding the sale of Pride Kia's
    inventory, regarding the administrative fees charged by KMA, regarding warranty
    practices, as well as other allegations in the Complaint. He is a fact witness;

b.  Lisa Dos Anjos is expected to testify regarding,  all of the damages suffered as a result
    of KMA's actions and the agreement with KMA to return Kia franchise, as well as
    other allegations in the Complaint.  She is a fact witness;

---

[3] The second proposed affirmative defense would assert that the alleged agreement is "barred by Section XII.B of the Standard
Provisions of the Dealer Sales and Service Agreement between Pride and KMA, which requires any such agreement to be in
writing."

c.  Nelson Rivera (address unknown) is expected to testify regarding warranty claims submitted to KMA, as well as other allegations in the Complaint.  He is a fact witness;

d.  Ken Domingues, Parts and Service Manager for KMA, (address unknown) will be asked about warranty claims submitted by Pride Kia, and parts purchased by Pride Kia.  He is a fact witness;

e.  Melanie Dougherty, Dealer Market Manager for KMA, (address unknown) will be asked about the agreement with KMA to return Kia franchise, including communications regarding that agreement.  She is a fact witness;

f.  Barbara Robinson, employee of KMA, (address unknown) will be asked about the agreement with KMA to return Kia franchise, including communications regarding that agreement.  She is a fact witness;

g.  Robert Cooke, employee of KMA, (address unknown) will be asked about the agreement with KMA to return Kia franchise, including communications regarding that agreement.  He is a fact witness;

h.  Adam Podlak, employee of KMA, (address unknown) will be asked about rebate claims submitted to KMA, as well as KMA's rebate policy and practices.  He is a fact witness;

i.  Michael Tocci, Regional Director, Eastern Region, for KMA (address unknown) will be asked about the agreement with KMA to return Kia franchise, including communications regarding that agreement.  He is a fact witness;

Pride does not intend to call the following witnesses in its case in chief, but may call them as rebuttal witnesses:

j.  Lee Tharp, Parts Manager for Pride Kia.  (Information regarding the ordering from, and return of parts to, KMA, as well as other allegations in the Complaint) a fact witness;

k.  Doug Stone, Service Manager for Pride Kia.  (Information regarding warranty claims submitted to KMA, as well as other allegations in the Complaint) a fact witness;

l.   Ken Talbot, Controller for Pride Kia.  (Information regarding warranty claims submitted to KMA, rebate claims submitted to KMA, KMA's administrative fees, as well as other allegations in the Complaint) a fact witness;

## 11.  Proposed Exhibits

a.   The dealer agreement between Pride Kia and KMA;

b.   Correspondence between Pride Kia and KMA employees Melanie Dougherty, Barbara Robinson, and other KMA employees;

c.   Documents relating to incentive claims made by Pride Kia to KMA including those relating to the sale of the following vehicles:

VEHICLE IDENTIFICATION
NUMBER (VIN)

| | |
|---|---|
| KNAGE123765023233 | KNADE123876199979 |
| KNAGE124765068844 | KNADE123X76203949 |
| KNAFE162055154628 | KNADEC165856266692 |
| KNDJC733145181791 | KNDUP131236413420 |
| KNDJC733645203879 | KNDUP131X46520748 |
| KNDJD733X45209021 | KNDUP131546536226 |
| KNDJC733545236355 | KNAFG525477027471 |
| KNAGD128645299110 | KNDJE723567242093 |
| KNDJC733065634446 | KNDJF724267272612 |
| KNDMB233266018857 | |

d.   Documents from KMA Part's computer system, as well as other records from Pride and KMA regarding warranty claims and the return of parts, including those relating to the following repair orders:

| | |
|---|---|
| 34469 | 52039 |
| 47260 | 52503 |
| 48832 | 52848 |
| 50601 | 52916 |
| 51224 | 55029 |
| 51547 | |

e.   Correspondence between counsel for Pride Kia and KMA.

f.  KMA "Credit/Debit Memo" dated April 14, 2008 identifying returned parts and totaling $70,184.17.

g.  KMA "Dealer Tool Return-Final" reflecting tools and equipment returned by Pride and identifying KMA's claimed value for each, and showing a total value of $9,863.19.

h.  Pride's records regarding its parts returns, and equipment purchases and returns.

i.  Pride's records regarding the purchase of signs from ImagePoint.

j.  Pride's records relating to KMA's "Administrative Fee"

k.  Pride's records of costs relating to the KMA parts computer system, including a summary thereof;

l.  Pride's records of floorplan interest charges on the new vehicles which were the subject matter of the agreement to repurchase and terminate, including a summary thereof;

m.  Pride's records of costs relating to the Reynolds and Reynold's charges incurred as a result of KMA's breach of its agreement, including a summary thereof;

## 12.  Pride's proposed jury instructions

Pride hereby submits, (in addition to the proposed instructions submitted jointly by the parties in a separate document) these additional proposed jury instructions.

CONTRACT FORMATION

1.   "If … the parties have agreed upon all material terms, it may be inferred that the purpose of a final document which the parties agree to execute is to serve as a polished memorandum of an already binding contract". Basis Technology Corp. v. Amazon.com, Inc.,  71 Mass.App.Ct. 29, 37-38, 878 N.E.2d 952, 960 (Mass.App.Ct., 2008) quoting

Goren v. Royal Invs., Inc., 25 Mass.App.Ct. 137, 140, 516 N.E.2d 173 (1987); See Novel

Iron Works, Inc. v. Wexler Constr. Co., 26 Mass.App.Ct. 401, 407-410, 528 N.E.2d 142

(1988); Restatement (Second) of Contracts § 27 (1981).

2.   "It is open to the parties to modify a written agreement by a later agreement not in

writing.... The later agreement may be proved through the conduct of the parties." Tomer v.

Hollister Associates, Inc., 2007 WL 2908268, 4 Mass.App.Ct.)   (Mass.App.Ct.,2007) citing

Schinkel v. Maxi-Holding, Inc., 30 Mass.App.Ct. 41, 47 (1991). See, First Pa. Mort. Trust v.

Dorchester Sav. Bank, 395 Mass. 614, 625 (1985) ("It is a settled 'principle that the mode of

performance required by a written contract may be varied by a subsequent oral agreement based

upon a valid consideration" ' [citations omitted]).

3.   An offer may be made orally or in writing, or even by a person's conduct. What is

important is that the offer be made in such a way as to justify another person in understanding

that [his/her] acceptance of the bargain will bind both parties to the terms of the offer. Chicopee

Concrete Serv. Inc. v. Hart Eng'g Co., 20 Mass. App. Ct. 315, 318 (1985); Gilbert & Bennett

Mfg. Co. v. Westinghouse Elec. Corp., 445 F. Supp. 537, 545 (D. Mass. 1977). See also Cataldo

Ambulance Serv. Inc. v. Chelsea, 426 Mass. 383, 386 n.6 (1998).

## IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

4.   In Massachusetts, there is an implied covenant of good faith and fair dealing between

the parties to a contract.

5.   The implied covenant of good faith and fair dealing means that neither party may do

anything that will have the effect of destroying or injuring the right of the other party to

receive the fruits of the contract.

6.   If the plaintiff has failed to act in good faith and has breached its implied covenant of good faith and fair dealing, the plaintiff cannot recover for subsequent breach of contract by the defendant.  CIVJIII MA-CLE 14. at § 13.1.12 citing Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471-74 (1991) (citing Druker v. Roland Wm. Jutras Assocs., 370 Mass. 383, 385 (1976)); Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004); Chokel v. Genzyme Corp., 449 Mass. 272, 276 (2007); Warner Ins. Co. v. Comm'r of Ins., 406 Mass. 354, 362 n.9 (1990); Fortune v. Nat'l Cash Register Co., 373 Mass. 96, 105 (1977); Kerrigan v. Boston, 361 Mass. 24, 33 (1972); 37 J. Nolan, Massachusetts Practice, Tort Law, § 11 at 10 (1979).

### BREACH OF CONTRACT

7.   To recover for a breach of contract, a plaintiff must establish [his/her] full and complete performance of all obligations under the contract. However, a material breach of the contract by one party excuses further performance by the nonbreaching party.  CIVJIII MA-CLE 14. at § 13.1.21 citing G.M. Abodeely Ins. Agency, Inc. v. Commerce Ins. Co., 41 Mass. App. Ct. 274 (1996); Lease-It, Inc. v. Massachusetts Port Auth., 33 Mass. App. Ct. 391, 396-97 (1992); Amarin Plastics, Inc. v. Maryland Cup Corp., 946 F.2d 147 (1st Cir. 1991).

8.   If a party has materially breached the contract, then the nonbreaching party is excused from further performance under the contract and may elect to rescind or cancel the contract, or it may affirm the contract and sue to recover for its damages.

9.   However, if a party breaches a contract in a nonmaterial way, the injured party may be entitled to bring an action for damages, but it may not stop performing its obligations under the contract.  CIVJIII MA-CLE 14 at § 13.3 <u>citing</u> <u>Lease-It, Inc. v. Massachusetts Port Auth.</u>, 33 Mass. App. Ct. 391, 396-97 (1992); E. Allan Farnsworth, Contracts § 8:16 (Little, Brown & Co., 1990).

10. Whether a material breach has occurred is a question of fact.  CIVJIII MA-CLE 14 at § 13.3 <u>citing</u> <u>Prozinski v. Northeast Real Estate Servs., LLC</u>, 59 Mass. App. Ct. 599, 609-10 (2003); <u>Lease-It, Inc. v. Massachusetts Port Auth.</u>, 33 Mass. App. Ct. 391, 396-97 (1992);

## DAMAGES

11. The seller may resell the goods, publicly or privately, in good faith and in a commercially reasonable manner. The seller's damages are the difference between the contract price and resale price, plus any incidental damages, and less expenses saved due to the buyer's breach. CIVJIII MA-CLE 14. at §13.3.1 <u>citing</u> G.L. c. 106, §§ 2-706, 2-710. <u>See</u> <u>Bevel-Fold, Inc. v. Bose Corp.</u>, 9 Mass. App. Ct. 576 (1980).

12.  The seller is entitled to the contract price for the goods delivered and accepted by the buyer, for which the buyer has not paid. CIVJIII MA-CLE 14. at §13.3.1 <u>citing</u> <u>Cesco Mfg. Corp. v. Norcross, Inc.</u>, 7 Mass. App. Ct. 837 (1979).

13. Damages must be proved with a reasonable degree of certainty. Thus, damages cannot be speculative. Any damages that the plaintiff claims to have suffered, including any

compensatory damages, must be computed by rational methods upon a firm factual basis.

Therefore, any damages sought must be proven and not left to speculation.

14.   In order to recover damages, a party must establish that [his/her] damages are

ascertainable by reference to some definite standard, either of market value, established

experience, or direct inference from known circumstances.

15.   However, a mathematical certainty in measuring damages is not a prerequisite for

recovery. CIVJIII MA-CLE 14. at §13.3.1 citing Rombola v. Cosindas, 351 Mass. 382

(1966); Lufkin's Real Estate, Inc. v. Aseph, 349 Mass. 343, 346 (1965); Snelling & Snelling

of Mass., Inc. v. Wall, 345 Mass. 634, 635-36 (1963); Whitespot Constr. Corp. v. Jetspray

Cooler, Inc., 344 Mass. 632, 635 (1962); Bond Pharmacy, Inc. v. City of Cambridge, 338

Mass. 488 (1959); John Hetherington & Sons, Ltd. v. William Firth, Co., 210 Mass. 8, 21-

22 (1911); Novel Iron Works, Inc. v. Wexler Constr. Co., 26 Mass. App. Ct. 401, 412

(1988); Gilmore v. Century Bank & Trust Co., 20 Mass. App. Ct. 49 (1985).

16.   Fair Market Value or "fair cash value" is defined as "the price an owner willing but not under compulsion to sell ought to receive from one willing but not under compulsion to buy." Taunton Redevelopment Associates v. Board of Assessors of Taunton, 393 Mass. 293, 295, 471 N.E.2d 75, 76 (Mass.,1984) quoting Boston Gas Co. v. Assessors of Boston, 334 Mass. 549, 566, 137 N.E.2d 462 (1956).

Respectfully submitted,
Pride Kia, Inc.,
By Its Attorney


/s/ Michael W. Carroll
Michael W. Carroll, BBO 563653
72 Pine Street
Providence, RI 02903
401 454-4900 (Tel.)
401 454-4902 (Fax)
